UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

In re:                                              Case No. 21-40139-KKS
                                                    Chapter 7
Julian Rodney Rooks Jr., self represented

      Debtor.

_____ /

Julian Rodney Rooks Jr. self represented            Adv. No.

      Plaintiff,

v.

St. Joseph's College of Maine,
St. Matthew's University (Cayman) Ltd.,
St. Matthew's University Inc.
United States Department of Education,

      Defendants.

_____ /


## **COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT**

### **JURISDICTION AND THE PARTIES**

    1.    This Court has jurisdiction under 28 U.S.C.§ 1334 because Plaintiff's dischargeability complaint arises under Title 11.

    2.    This is a core proceeding pursuant to 28 U.S.C. §157(a), (b)(1) and (b)(2) (I) and (b)(5).

3.     This is an action seeking a determination of dischargeability of student loan debt due to certain Defendants' false representations, written misrepresentations, and/or fraud, Defendant U.S. Department of Education's refusal to discharge said debt and/or alternatively a determination of dischargeability pursuant to 11 U.S.C. §523(a) (8)(A) and (B) and to recover damages.

4.     Plaintiff Julian Rodney Rooks Jr. is an individual living in Tallahassee, FL who filed a Chapter 7 bankruptcy petition on April 15, 2021 in case number 21-40139-KKS.

5.     The Department of Education (ED) is an agency of the United States government holding Plaintiff's educational debts of approximately $226,410.39.

6.     Upon information and belief, Defendant St. Matthew's University Inc., a Delaware corporation and St. Matthew's University (Cayman), Ltd., a Cayman Islands corporation doing business as St. Matthew's School of Medicine, are related and collectively referred to in this complaint as (SM).

7.     Defendant St. Joseph's College of Maine (SJ), is an educational institution located in Standish, Maine. SJ offered a Graduate Degree study program to SM students. It was SJ's Title IV Stafford Loan Program that was the source of the Higher Education Act (HEA) funds at issue in this complaint.

8.     Venue is proper because Plaintiff resides in Leon County and filed for Chapter 7 relief in the Northern District of Florida.

## FACTUAL ALLEGATIONS

9.     In 2019, the American Medical Association reported that 23.6% of U.S. Physicians were International Medical Graduates (IMG's). Students attend the first half of medical school at a foreign campus and then return to the U.S. to complete 2 years of clinical training.

10.    Plaintiff attended The Florida State University from 1988–1991 earning a

degree in Biological Sciences. He worked 30-40 hours per week to pay tuition and

expenses, received a grant his senior year and had no education loans prior to medical

school.

11.    Plaintiff was the first in his family to complete university but he was not

wealthy and relied on Title IV Stafford Loans and private loans to attend medical school.

He looked for a school that offered Stafford Loans and in 1993 successfully completed

semester 1, took an approved leave of absence, returned to Tallahassee, divorced and

when he was ready to return the school was destroyed by a volcano.

12.    Plaintiff found another medical school that offered Stafford Loans and

successfully completed semester 2 in 1997. During this time, the military was on the

streets, no one was allowed out and he watched running gun battles as a coup attempt

unfolded. Plaintiff returned to Tallahassee and began looking for another school with

Stafford Loans.

13.    Plaintiff completed medical school from semester 3 to the end at SM while

attending SJ's distance education program through most of this time. He completed all

coursework on the first attempt with a passing score and was never the subject of any

disciplinary action by either defendant or any other medical school.

14.    In late 1998, Plaintiff spoke by telephone from Tallahassee with SM's Vice

President Dr. Jerry Thornton who stated to him that SM had US government student

loans and that he was on the faculty of the first medical school he attended and on the

3

cover of its catalog. SM sent a catalog to Plaintiff in Tallahassee listing Dr. Thornton

under "St. Matthew's Faculty" (exhibit 1). Plaintiff applied to SM about November 30,

1998, paid about $75.00 and received an acceptance letter a few days later.

15.    SM was not eligible to receive Title IV student loans.

### Count I- Fraudulent misrepresentation/Negligent misrepresentation.

16.    Plaintiff incorporates paragraphs 1-15 above as though fully restated

herein.

17.    Defendant SM's Vice President, Dr. Jerry Thornton, made a false

representation of a material fact, that his school had US government student loans, that he

knew or should have known was false, or the representation was negligently made.

18.    Defendant SM's Vice President's misrepresentation, was intended to

induce Plaintiff's reliance. Plaintiff's reliance, both actual and reasonable, was

detrimental and Plaintiff suffered harm/damages.

19.    After several calls to SM to make arrangements, Plaintiff learned in a

round-about way that he would have to apply to SJ's Graduate Studies program in order

to receive the Stafford Loan.

20.    In January, 1999, Plaintiff again spoke to Dr. Jerry Thornton by telephone

from Tallahassee (exhibit 4). Dr. Thornton told him to use the Stafford Loan to pay

tuition to SM, what he called an incentive of $750.00 refunded to the Plaintiff from SM

to pay half of SJ's tuition and offered to defer $2,400 in tuition. Plaintiff sent an

application to SJ in Maine in January 1999.

## MOVE FROM TALLAHASSEE TO BELIZE

21.    Plaintiff moved from Tallahassee to Belize about January 12,1999. In January 1999, 2 envelopes arrived at Plaintiff's parent's home (his US mailing address), postmarked January 7, 1999 (exhibits 2 and 3). The letters inside these envelopes state: "Dear Incoming St. Matthews Student: We have been advised that you have been accepted by the St. Matthews University School of Medicine and that you intend to apply for admission to the Master in Health Services Administration (MHSA) Program at St. Joseph's College.", "I preregistered you for HSA 515 and HSA 575 today" and "each time you reenroll.".

22.    Plaintiff alleges an agreement existed in January 1999 between defendants SJ and SM that SM would act, with authority, for the benefit of SJ and that SJ told SM what to do (use it's Title IV Stafford Loan program) and how to do it (refund half of SJ's tuition to the student from the Stafford Loan funds as an "incentive").

### Count II- Negligence

23.    Plaintiff incorporates paragraphs 1-22 above as though fully restated herein.

24.    Defendant SJ had a duty to exercise reasonable care. Defendant SJ failed to exercise reasonable care of its Title IV loan program and that failure was the cause, both actual and proximate, of Plaintiff's damages.

25.    On March 10, 1999, Plaintiff emailed Dr. Thornton from the SM campus in Belize notifying him of the arrival of the Stafford Loan in Plaintiff's U.S. bank. On March 11, 1999, Dr. Thornton responded by email writing a repeat of what he offered

Plaintiff about 2 months earlier by telephone and directed Plaintiff, in writing, to use
Stafford Loan funds to pay tuition to SM (exhibit 4). Plaintiff initialed the printed email
and the SM clerk gave him this copy (exhibit 4). That same day, Plaintiff wrote a check
number 688 from the Stafford Loan funds to SM for "3,250.00" (exhibit 5) and SM
cashed the check. A copy of this Loan Application is attached as exhibit 6.

26.     The letters "JR" appear beside the total amount. Plaintiff did not write this.
His initials are on the above email exhibit 4 and about 32 months later on exhibit 30.

27.     In 1999, Plaintiff received these 2 memos in his SM campus mailbox from
SJ (exhibits 7, 8).

28.     When another Stafford loan arrived around October, Plaintiff wrote check
number 671 on October 8, 1999 from those Stafford funds to SM for "3,250.00" (exhibit
9) and SM cashed the check. SM's Registrar gave Plaintiff a receipt number "065"
(exhibit 10). A copy of the Loan Application is attached as exhibit 11.

29.     On 11-29-1999 Plaintiff met face-to-face with Renae M. Sersland, SM's
Director of Financial Aid, who stated that he would be suspended if he did not pay the
amount Dr. Thornton offered to defer (exhibit 12). Plaintiff asked his parents, who had
purchased and moved into a home in Tallahassee, to apply for the loan (exhibit 13). It
was approved and the money was paid to SM by the lender (exhibit 14).

RETURN TO TALLAHASSEE FROM BELIZE

30.     When Plaintiff returned to Tallahassee in January 2000, Dr. Thornton told
him Stafford Loans were no longer available, to call the school's attorney and on

8/22/2000, Roger C. Courtney Esq. sent this fax from 703-764-2509 at "GLOBAL

ED RESOURCES" (GER) to Plaintiff in Tallahassee detailing a loan from Student

Finance Corporation (SFC), hereinafter (the GER/SFC loan) (exhibit 15).

31.    On 9/22/2000 the State of Florida administratively dissolved SM.

32.    In late December of 2000, SFC mailed this Student Application (exhibit

16) and this Cosigner Application (exhibit 17) to Plaintiff in Tallahassee and SM's

Registrar Gloria Miranda-Avila (Gloria) told Plaintiff to apply for $29,000 with his

parents as cosigners. A few days later, Gloria told him that the GER/SFC loan was

approved and his rotations were ready in Chicago and he moved from Tallahassee to

Chicago on or about 01/09/2001 and began clinical training.

33.    Upon information and belief, none of these 3 entities, (SM, GER, or SFC)

possessed a license to conduct business in the State of Florida and was not licensed to

offer or execute contracts with Florida consumers.

MOVE FROM TALLAHASSEE TO CHICAGO, ILLINOIS

34.    Dr. Frank Olusegun Apantaku M.D. is listed in SM's year 2000/2001

catalog on page 31 under "Clinical Faculty and Preceptors" (exhibit 18). He was SM's

Clinical Coordinator for Plaintiff's clinical studies and he gave him this card at their first

meeting in early January 2001 (exhibit 19). His office was located in Suite 320 at 2222

West Division Street. Plaintiff took this picture in early 2001 and 2222 is visible on the

building he is in (exhibit 20). Plaintiff took this picture seconds later in the same room

which was directly adjacent to Dr. Apantaku's office (exhibit 21). This is the room in

which Plaintiff took each clinical core test. Dr. Apantaku's office is directly through the wall on the right. That office through the wall on the right was the office containing the fax machine who's number was 773-342-1010.

THE JUNE, 2001 EVENT

35.     The following events described in this news publication occurred in early June of 2001. In this local newspaper interview dated June 14, 2001, SM's previous owner describes a "hostile takeover" and "the newly elected President and Chief Operating Officer of St. Matthew's International, Dr. Jerry Thornton" and "Named as director of Financial Aid was Gloria Miranda-Avila who works out of the Orlando, Florida office" (exhibit 22). On June 28, 2001, the same publication printed "several people involved in the takeover of administration were seen removing files from administrative offices. Witnesses also observed shredded material in these offices after that fact." (exhibit 23).

36.     Plaintiff alleges Defendant SM lost his medical school records during this event.

37.     Plaintiff was enrolled in SJ's Distance Education Program at this time (exhibits 24, 25, 26).

38.     Plaintiff believes there was a fiduciary relationship and that one or both had a duty to speak, however, neither ever gave any indication of this event or that the records had been lost.

## Count III- Breach of Contract (intentional/non-intentional)

39.     Plaintiff incorporates paragraphs 1-38 above as though fully restated herein.

40.     Defendant SM committed the conduct purposefully, and with malice by failing to tell him about the loss.

41.     Defendant SM had a duty to exercise reasonable care. Defendant SM failed to exercise reasonable care by losing Plaintiff's medical school records when it had a duty to keep them.

42.     Defendant SM's failure to exercise reasonable care was the cause, both actual and proximate, of Plaintiff's damages.

43.     A contract existed, both in writing and implied in fact between Plaintiff and Defendant SM.

44.     Defendant SJ is vicariously liable for the contract entered into by the agent on their behalf.

45.     Plaintiff spoke with Roger Courtney on 06/13/2001, at 4:57 (exhibit 27), and on 07/05/2001, at 4:21 (exhibit 28). He told Plaintiff to continue paying SFC. About 3 hours later, at 7:45pm (exhibit 28), Plaintiff called his parents in Tallahassee and told them what Roger Courtney said they should do and the next day, on 07/06/2001, Plaintiff's spouse wrote check number 396 to SFC for $400 and SFC cashed the check (exhibit 29). Mr. Courtney gave no indication whatsoever of the event Plaintiff alleges

9

had occurred on or about 6/4 of 2001 or that he was no longer working for SM.

46.    After this call, Mr. Courtney did not answer Plaintiff's calls or return his messages. Plaintiff and his parents never had any disagreement with Mr. Courtney and always promptly followed his directions. Plaintiff developed a good report with Mr. Courtney and had spoken with him so many times over the previous 14 months that a running joke had developed between them which was that every time they spoke Mr. Courtney was again having to pay to repair his daughter's Chrysler Le Baron. Plaintiff and his parent cosigners felt Mr. Courtney abandoned them.

### RELEASE OF CLAIMS/NONDISCLOSURE AGREEMENT

47.    On 08/20/2001 at 12:55, SM's Registrar Gloria faxed to Plaintiff in Chicago these 5 pages (exhibit 30) including a letter from Dr. Thornton stating "if you do not agree with the "release of claims" form and are unwilling to sign it we cannot release your Student Finance Corporation monthly funds." This Release of Claims included a nondisclosure agreement (NDA). Plaintiff would not have signed this agreement if he had been aware of the loss of his records he alleges occurred about two months earlier. Two days later on 08/22/2001, at 3:36pm, Plaintiff faxed the documents to the number Gloria wrote on the first page which he believes was to the Maryland-Delaware-Virginia area (exhibit 31).

48.    Plaintiff invokes equitable estoppel to estop defendants from asserting a statute of limitations/laches style affirmative defense.

49.    On 12/10/2001, SM was reinstated as a Florida LLC.

50.    When SM failed to make any of the promised payments, Plaintiff called
Gloria who sent these documents to him in Chicago (exhibit 32). They are the only copies
Plaintiff can locate. Gloria stated to Plaintiff that because this loan was replacing the
GER/SFC loan he and his parents should back-date it to the date that was typed on the
first page. On 04/10/2002 Plaintiff's spouse wrote check number 447 for $410.83 to SM
and SM cashed the check (exhibit 33). SM's name is spelled "MATTHWES" in the
signature block on page 4.

51.    Upon information and belief, SM failed to possess a license to conduct
business in the State of Illinois and was not licensed to offer or execute contracts with
Illinois consumers.

ROTATION IN TRAUMA SURGERY

52.    From 5/6/2002 to 5/31/2002, Plaintiff performed a senior clerkship in
trauma surgery at Cook County Hospital (CCH) in Chicago, IL (exhibit 34). This rotation
was performed at a Graduate Medical Education (GME) training program, accredited by
the Accreditation Council for Graduate Medical Education (ACGME), a federally funded
program under the U.S. Department of Health and Human Services, whose requirement
states "Please Note: The application and transcript must be sent by the medical school.
**Applications received directly from you will not be processed.**" (exhibit 35).

53.    Plaintiff submits proof of 2 faxes (exhibit 36, fax number 2 and number 3)
and alleges the existence of a third fax (fax number 1).

54.    Fax number 1- (alleged existence) allegedly sent from SM's Florida office

11

to SM's Clinical Coordinator's office in Chicago, probably sent on the morning of
5/3/2002, of at least 2 pages and then combined with the Clinical Coordinator's records
and sent later that same day as pages 13 and 14 of fax number 2 to CCH.

55.    Fax number 2 (exhibit 36)- sent on "May 03 02 12:11p", of about 14
pages, sent from 773-342-1010 to CCH. Pages 1-12 are SM's Clinical Coordinator's
records from Chicago. Pages 13 and 14 are SM's pre-Chicago official transcript.

56.    Fax number 3 (exhibit 36)- sent on "08 02 04:56p", of about 3 pages.
Although the word "May" cannot be seen, Plaintiff alleges this fax was sent on May 08,
2002, at 4:56 pm, 5 days after fax number 2.

57.    Upon information and belief, this fax was sent directly from
SM in Florida to CCH in Chicago.

58.    Both the Clinical Coordinator's records and SM's records are false. SM's
Clinical Coordinator's records (exhibit 36, fax number 2) state the Medicine rotation with
a physician's signature which is not true. This Medicine rotation was performed in June,
2001, under the Physician who wrote this recommendation for Plaintiff stating so and
mailed it to him in this envelope (exhibit 37).

59.    These copies of these faxes were placed in the Plaintiff's hand shortly after
this rotation began, by the secretary in the medical education office at CCH who offered
him a copy of his file. Plaintiff alleges 773-342-1010 was the fax number of the fax
machine located in the office of SM's Clinical Coordinator, Dr. Frank Apantaku.

60.    If the defendants had not sent these made-up records, the Plaintiff's

12

rotation would have come to a full stop and the alleged loss may have been discovered at that time.

61.    A residency is required to become a licensed physician. All residency programs are unified GME programs. Plaintiff can never be a physician after his medical school tainted him when it sent false records to a GME program.

### Count IV- Plaintiff alleges special damages.

62.    Plaintiff incorporates paragraphs 1-61 above as though fully restated herein.

63.    Defendant SM committed the conduct purposefully, ending Plaintiff's medical career when SM's Clinical Coordinator's office pushed the "send" button on the fax machine on May 03, 2002, at 12:11 pm., and when SM's Florida office pushed the "send" button again on May 08, 2002 at 4:56pm, by sending records it knew were false to a GME training program.

### RETURN TO TALLAHASSEE FROM CHICAGO, ILLINOIS

64.    Plaintiff completed clinical training in Chicago and returned to Tallahassee in March of 2003.

65.    In March or April of 2003, Plaintiff received this invitation to graduation mentioning St. Matthew's University Cayman four times and that "the Board of Directors has authorized St. Matthews University to pay for a two night stay" and a "special offer" (exhibit 38).

66.    Plaintiff called SM's Florida office to make arrangements and spoke with

13

Darlene Burke who stated he could not graduate until he paid about $22,000. Plaintiff

asked for an invoice. Ms. Burke then stated that Plaintiff could graduate if he filled out

these 4 forms SM mailed to him in Tallahassee (exhibit 39). Plaintiff followed Ms.

Burke's directions and faxed these back to SM on 06/27/2003 (exhibit 40). Three days

later, on 6/30/2003, SM sent this fax to Plaintiff in Tallahassee (exhibit 41).

67.    SM demands over $21,000. These 4 invoices use 2 different names, "St.

Matthew's University" and "St. Matthew's University (Cayman) Ltd.".

68.    Notably absent from this invoice is the CCH rotation. It should be on fax

page 4, invoice page 2, between "4/26/02" and "6/28/02". The invoice skips the month of

May and starts again at the end of June. The date "Feb. 12. 1996" appears on each page.

After Plaintiff received this fax Darlene Burke stated to him "You have to pay whatever

SM says you owe".

69.    On 9/19/2003, the State of Florida administratively dissolved SM.

70.    In March 2004, SM's Registered Agent, Darlene Burke, filled out an

"Application by Foreign Corporation to Transact Business in Florida" for "St. Matthew's

University (Cayman) Ltd. and the State of Florida responded (exhibit 42).

71.    In February of 2005, The State of California released this report (exhibit

43) stating:

page 2;

> In **August 2001**, the Division became aware of serious turmoil on the
> Belize campus resulting in the eventual loss of all facilities there.

14

page 4;

> Jerry Thornton, Ph.D., Vice President and Chief Operations Officer (COO) has been with SMUSOM since Belize days. He is in charge of operations at the head office in Florida, which includes admissions, financial aid, marketing and advertising. He has also been the principal contact between SMUSOM and the Division.

page 16;

> Through prior personal contacts between representatives of SMUSOM and St. Joseph's College of Maine "(SJCOM"), an ongoing on-site and distance-learning program leading to a Master's Degree in Health Science Administration (MHSA) was identified at SJCOM in Windham ME, and deemed suitable for the stated purposes. Negotiations between the two institutions led to formal agreements and the first SMUSOM students were concurrently enrolled in the SJCOM MHSA program in the Year 2000.

72.     Around this time, Plaintiff began receiving calls from individuals claiming to be from the US Department of Education calling on behalf of SM.

73.     Plaintiff's life and the lives of his parent cosigners became significantly worse.

74.     On or about 11/04/2005, Plaintiff met with Dr. Thornton in his office at SM in Oviedo, Florida, and paid SM $1,000 and made at least 4 more payments of $400.00 (exhibit 50). Plaintiff asked him for a transcript and certification to take the medical board exam but he refused. He gave no indication that the school had lost Plaintiff's records. Dr. Thornton sat behind a deeply carved dark wood desk with a matching giant bookcase.

75.     In late 2005/early 2006, the new corporation, St. Matthew's University (Cayman) Ltd., was merged into SMU Acquisition Corp., a Delaware corporation, and the surviving corporation was named St. Matthew's University, Inc., also a Delaware corporation (exhibits 44, 45). The "Plan of Merger" states;

15

Merged Company, without the necessity for any separate transfers. The Surviving Corporation
shall thereafter be responsible and liable for all liabilities and obligations of the Merged
Company, and neither the rights of creditors nor any liens on the property of the Merged
Company shall be impaired by the merger.

76.     In 2006, Plaintiff's divorce was finalized after his spouse became
unhinged (exhibits 46, 47).

77.     On August 4, 2007, Plaintiff's father, with whom he shared a common
name, died (exhibit 48).

78.     In 2008, Plaintiff made more payments to SM (exhibit 49) and received
this invoice (exhibit 50).

79.     Sometime between late 2007 and the end of 2008, Plaintiff met with SM's
Chancellor, Dr. Gary McCutcheon in his office at SM in Orlando, Florida. He gave
Plaintiff this card (exhibit 51) and Plaintiff wrote down what he said on the back. When
Plaintiff asked him if SM would certify him to take the board exam Dr. McCutcheon
stated, "not unless you've got a check for $17,000". He then stated "You know, we could
just say you forged your board application". Plaintiff flatly denies doing this. He gave no
indication that the school had lost Plaintiff's records. A plastic model of an F-14 sat on
the shelf behind him.

80.     In February 2009, in this email exchange with the Florida office (exhibit
52), SM's Registrar, Jennifer Applequist, states Plaintiff was withdrawn from SM on
April 24, 2003, which he had never heard before, that he would have to "address your
outstanding financial balance", that items were "missing" from his file and that only after

these issues were addressed could he apply for readmission to SM and take another test in addition to the 6 additional tests Dr. McCutcheon listed. This date, April 24, 2003, is around the time Plaintiff received the invitation to graduation and before Darlene Burke sent the "Intent to Graduate Form".

81.     The exams she refers to as "missing" were all taken while seated at this table, in this room, in this photo taken by Plaintiff (exhibit 21) and the "final grades" faxed by SM's Clinical Coordinator, Dr. Apantaku, from his office to CCH on 05/03/2002 at 12:12p (exhibit 36).

82.     After this, Plaintiff felt like SM had moved the goalpost so far that it had no intention of certifying him to sit for the board exam or give him an official transcript or his degree.

83.     In 2009, this email was sent to the ED (exhibit 53). It is shown redacted as it was discovered. Plaintiff believes the substance of the letter and the reason for the redactions are part of the who, what, when, where and how the Title IV loan program was misrepresented to Plaintiff, why the ED refuses to discharge Plaintiffs loans obtained under this program and why the ED would fail to provide these documents under Plaintiff's Freedom of Information Act (FOIA) request 8 years later.

84.     In 2010, he applied to another medical school and was accepted-pending an official transcript from SM. When Plaintiff told the President of the school that SM would not give him a transcript, he told him to ask one more time and just see what happens.

17

85.     This time, Plaintiff did not call, visit or email. He sent in a form with payment and received by mail the first official transcript SM had given him (exhibit 54).

86.     This transcript contains multiple courses Plaintiff never took while omitting multiple courses he did take.

87.     Notably absent is the semester containing June 2001, and the CCH rotation. On the left is the official transcript fax number 2 (exhibit 36) to CCH. On the right is this official transcript  (exhibit 54).

| Official transcript faxed to CCH on 05/03/2002 and again on "08 02". | Official transcript postmarked JUN 2010. |
|---|---|

- Bioethics
- Embryology
- Histology & Histophysiology
- Physiology
- Biochemistry
- Clinical Medicine I
- Medical Terminology
- Clinical Medicine II
- Biostatistics
- Endocrinology
- Molecular & Cell Biology
- Gross Anatomy I

**Spring 1999**
- Clinical Medicine III
- Clinical Medicine IV
- Genetics

**Summer 1999**
- Pharmacology
- General Pathology
- Psychopathology
- Nutrition

**Fall 1999**
- Immunology
- USMLE Review
- Microbiology
- Clinical Pathology
- Clinical Medicine V
- Neuroscience

**Spring 2001**
- Surgery Core

**Summer 2001**
- Internal Medicine Core

Right column:
| MD115 | Medical Terminology |
| MD116 | Basic Life Support |
| MD124 | Biostatistics |
| MD143 | Molecular & Cell Biology |
| MD161 | Biochemistry |
| MD162 | Gross Anatomy I |
| MD216 | Behavioral Psychology |
| MD253 | Histology & Histophysiology |
| MD262 | Gross Anatomy II |
| MD271 | Physiology I |
| MD323 | Endocrinology |
| MD324 | Ethics |
| MD361 | Neuroscience |

**Spring 1999**
| MD224 | Embryology |
| MD316 | Clinical Medicine III |
| MD325 | Immunology |
| MD352 | Microbiology |
| MD415 | Journal Club |
| MD434 | Clinical Medicine IV |

**Summer 1999**
| MD317 | Nutrition |
| MD443 | Psychopathology |
| MD462 | Pharmacology |
| MMD471 | General Pathology |

**Fall 1999**
| MD225 | Genetics |
| MD543 | Clinical Medicine V |
| MD572 | USMLE Review |
| MD581 | Pathology II: Systemic Pathology |

**Spring 2001**
Surgery

**Fall 2001**
Internal Medicine Elective
Family Medicine Elective

**Spring 2002**
Vascular Surgery
Nephrology Elective
Emergency Medicine Elective

**Summer 2002**
Infectious Disease

| Start Date | End Date | Hospital/Site | Core/Elective Name |
|---|---|---|---|
| 10/29/2001 | 11/23/2001 | Jackson Park Hospital | Family Medicine Elective |
| 4/3/2002 | 4/30/2002 | Cook County Hospital | Anestesiology Elective |
| 3/4/2002 | 3/29/2002 | Jackson Park Hospital | Emergency Medicine Ele |
| 11/26/2001 | 1/18/2002 | Jackson Park Hospital | Internal Medicine Elective |
| 1/21/2002 | 3/1/2002 | Jackson Park Hospital | Nephrology Elective |
| 10/29/2001 | 11/23/2001 | Jackson Park Hospital | Family Practice Core |
| 6/25/2001 | 8/3/2001 | Jackson Park Hospital | Psychiatry Core |
| 8/6/2001 | 9/14/2001 | Jackson Park Hospital | Pediatrics Core |
| 9/17/2001 | 10/26/2001 | Jackson Park Hospital | OB/GYN Core |
| 1/8/2001 | 3/30/2001 | Jackson Park Hospital | Surgery Core |
| 4/2/2002 | 6/22/2001 | Jackson Park Hospital | Internal Medicine Core |
| 11/26/2001 | 1/18/2002 | Jackson Park Hospital | Internal Medicine Elective |
| 6/3/2002 | 6/28/2002 | Michael Reese | Radiology Elective |
| 5/6/2002 | 5/31/2002 | Cook County Hospital | Trauma Elective |

19

## Count V- Fraudulent/Negligent Misrepresentation

88.     Plaintiff incorporates paragraphs 1-87 above as though fully restated herein.

89.     Defendant SM committed the conduct purposefully, providing Plaintiff with materially false statements in writing- including exhibits 30, 32, 36, 41, 50, 51, 52, 54 and 59, each of which represents that Defendant SM had Plaintiff's correct medical school records when it did not.

90.     Plaintiff alleges the defendants pattern of conduct over many years constitutes malice because its acts and failures to act created the illusion of the nonexistence of the loss.

91.     Defendant SM made false/negligent representations of material facts, with knowledge of the falsity and with intent to induce reliance.

92.     Plaintiff's reliance, both actual and reasonable, was detrimental.

93.     Plaintiff suffered harm.

94.     Plaintiff left messages for Dr. Apantaku but he failed to respond. On 11/28/2011, at about 10:38, he called Chicago from Tallahassee and spoke to Dr. Apantaku's secretary who stated that Dr. Apantaku had received his messages, that his folder was empty, that Dr. Apantaku had taken it and that he should call SM's Clinical Coordinator named Kim and he did about 4 minutes later. Kim told him she started in 2003, that SM did not keep records before 2003, that there were no tests or sign-in sheets in his folder and that they were sent to the school. She told him to call SM's Registrar and

20

he did at about 10:50am and it was Gloria from 10 years earlier. Gloria told him she did

not remember him, to send all documents he had about SM to her and stated "I don't

know about your situation. I've only been here for about a year". After seeing this

transcript and hearing this from Gloria, Plaintiff began looking for answers on his own.

95.    In January and March of 2014, Plaintiff received 2 letters from the lenders

demanding he quickly sign new promissory notes for all Title IV loans. One letter gave

him 7 days, the other 48 hours (exhibits 55, 56).

96.    About 3 months later, in June 2014, Plaintiff received 2 letters stating the

lenders had requested removal of Plaintiff from the Treasury Offset Program (TOP)

(exhibits 57, 58).

97.    In July 2015 Plaintiff received this stating "co-signer/co-borrower"(exhibit

59).

98.    In the summer of 2015, Plaintiff figured out what happened by comparing

the pattern of  what was missing and different in his personal records, his personal

experiences as mentioned above and from these records obtained from public sources

(exhibits 22, 23, 42, 43, 44, 45, 53).

99.    On 01/22/2016, Plaintiff filed a Chapter 7 Petition and Adversary

Complaint in this district, dismissed on 03/30/2016.

100.    On 09/19/2016 FMS Investment Corp threatened litigation by the U.S.

Department of Justice (exhibit 60).

101.    On 11/24/2017 Plaintiff mailed a FOIA letter to the ED requesting 4

disclosures. The green card's "Date of Delivery" he received in the mail had been changed with red ink, not by the Plaintiff (exhibit 61).

102.    On 12/13/2017 the ED signed for Plaintiff's request to discharge his loans containing 15 pages, 45 exhibits and a signed Oath and Affidavit but he did not receive a response (exhibit 62).

103.    On 01/31/2018, about 2 months after sending the FOIA request, Plaintiff called the ED because he had not received a response. A person identifying as Kim Jones answered the phone. She stated the ED had not received the FOIA request. Plaintiff stated that a K Jones signed for it. She asked his name and stated there was "no entry in the system for that name". She asked him to resend it and he emailed it to her at 12:26pm (exhibit 63). Later that day, Plaintiff received by email this unsigned FOIA response stating, "This is in response to your letter dated November 5, 2017" (exhibit 64). Plaintiff's FOIA request was not dated 11/05/2017, it was dated 11/22/2017, mailed on 11/24/2017 and signed for on a delivery date written over.

104.    On 2/01/2018, Plaintiff asked the ED to correct this error but he did not receive a response (exhibit 65).

105.    On or about 03/02/2018, Plaintiff received the ED's FOIA response and 2 letters. Letter 1 responds to requests 1 and 3 with answers to requests Plaintiff did not make and notably skips request 2. Both pages are numbered "page 2" and Plaintiff's address is wrong (exhibit 66). Letter 2 addresses question 4 but changed the words of the request into something the Plaintiff did not request (exhibit 67).

22

106.    The ED's response included 9 documents (exhibit 68), one for every HEA

loan at issue in this case, each titled;

<u>IDEMNIFICATION AGREEMENT FOR THE ASSIGNMENT OF FEDERAL
FAMILY EDUCATION LOAN WITH DAMAGED PROMISSORY NOTE OR
PROMISSORY NOTE WITH UNINITIALED ALTERATIONS</u>

Each states:

agrees that if any loan assigned to the Secretary by the Guaranty Agency
without an original promissory note or certified true copy in good condition
should become uncollectable by reason of such damaged promissory note or
because it contains alterations without the borrower's initials, or if the
Secretary, in his sole discretion, determines that the loan cannot be enforced
because of the damaged or altered promissory note, the Secretary is entitled to
recover from the Guaranty Agency the amount of reinsurance attributable to such
loan previously paid to the Guaranty Agency, plus interest from the date the
reinsurance was paid.  The Secretary may recover amounts due under this
agreement by withholding such amounts from any payments due to the Guaranty
Agency from the Department of Education.

107.    They are each dated 06/11/2014.

108.    The ED keeps Plaintiff in TOP (exhibit 69).

109.    Plaintiff mailed a timely Administrative Appeal of this FOIA request on

05/25/2018, but did not receive a response (exhibit 70).

110.    Three months later, in August 2018, the ED hired a debt collector who

demanded $226,410.39. When Plaintiff requested validation, the collector threatened

"litigation through the U.S. Department of Justice" (exhibit 71).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests the following relief:

(1) that this Court enter an Order determining the debt owed by Plaintiff is

dischargeable and any other such relief as the Court deems just and proper.

(2) award damages to Plaintiff as a lump sum amount equal to the annual "Median Pay" of a Physician according to US Department of Labor statistics equal to a period of 35 years totaling $6,552,000, plus interest at the maximum allowable rate or whatever amount a jury finds to be reasonable and just compensation and any other relief as the Court deems just and proper.

(3) award treble damages totaling $19,656,000 as to the aggravating circumstances which would justify an award of punitive damages on all causes of action or whatever amount a jury finds to be reasonable and just compensation and any other relief as the Court deems just and proper.

Plaintiff respectfully request the above relief and such other and further relief as this Court may deem just and proper.

### **Demand for Jury Trial**

Plaintiff demands a trial by Jury and consents to have the jury trial conducted by a bankruptcy judge.

RESPECTFULLY SUBMITTED,

DATED: 7/22/2021

PLAINTIFF

Julian Rodney Rooks Jr.

PATREKA DANIELS
Commission # GG 917453
Expires January 27, 2024
Bonded Thru Troy Fain Insurance 800-385-7019

FL DLR 200 436-66-430-0

3648 Dartford Lane
Tallahassee, Florida 32311
(850) 364-0312

24

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

In re:                                                    Case No. 21-40139-KKS
                                                          Chapter 7
Julian Rodney Rooks Jr., self represented

    Debtor.
_____/

Julian Rodney Rooks Jr. self represented          Adv. No.

    Plaintiff,
v.

St. Joseph's College of Maine,
St. Matthew's University (Cayman) Ltd.,
St. Matthew's University Inc.
United States Department of Education,

    Defendants.
_____/


## OATH AND AFFIDAVIT

    I, Julian Rodney Rooks Jr., am the Plaintiff in the above titled action. I have read the foregoing complaint. The facts stated therein are within my knowledge and are true and correct, except those matters stated on information and belief, and, as to those, I believe them to be true and correct. I declare under penalty of perjury under the laws of the State of Florida that the foregoing is true and correct.


DATED: 7/22/2021

                                    RESPECTFULLY SUBMITTED,
                                    PLAINTIFF

                                    Julian Rodney Rooks Jr.

PATREKA DANIELS
Commission # GG 917453
Expires January 27, 2024
Bonded Thru Troy Fain Insurance 800-385-7019

FL DL
R200-436-66-430-0

                                    3648 Dartford Lane
                                    Tallahassee, Florida 32311
                                    (850) 364-0312